IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PRIESTS FOR LIFE
20 Ebbitts Street, Staten Island, New York 10306

FATHER FRANK PAVONE
20 Ebbitts Street, Staten Island, New York 10306

ALVEDA KING
20 Ebbitts Street, Staten Island, New York 10306

JANET MORANA
20 Ebbitts Street, Staten Island, New York 10306

       Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 Independence Avenue, SW, Washington, DC 20201

KATHLEEN SEBELIUS, in her official capacity as
Secretary, U.S. Department of Health & Human Services
200 Independence Avenue, SW, Washington, DC 20201

UNITED STATES DEPARTMENT OF THE
TREASURY
1500 Pennsylvania Avenue, NW, Washington, DC 20220

JACOB J. LEW, in his official capacity as Secretary,
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW, Washington, DC 20220

UNITED STATES DEPARTMENT OF LABOR
200 Constitution Avenue, NW, Washington, DC 20210

THOMAS E. PEREZ, in his official capacity as
Secretary, U.S. Department of Labor
200 Constitution Avenue, NW, Washington, D.C. 20210

      Defendants.

**COMPLAINT**

Plaintiffs, by and through undersigned counsel, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

## INTRODUCTION

1.      This is a civil action in which Plaintiffs are seeking to protect and defend religious freedom.  Plaintiffs are challenging the implementing regulations of the Patient Protection and Affordable Care Act ("Affordable Care Act") which require certain employers, including Plaintiff Priests for Life, to provide insurance plans that include coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling (hereinafter also referred to as "contraceptive services mandate").

2.      Plaintiffs seek a declaration that the contraceptive services mandate violates federal constitutional and statutory law and a preliminary and permanent injunction enjoining its enforcement.  Indeed, the contraceptive services mandate is unconstitutional on its face and as applied in that it violates Plaintiffs' rights to the free exercise of religion, the freedom of speech, and expressive association under the First Amendment; it violates the Establishment Clause of the First Amendment; it deprives Plaintiffs of the equal protection of the law guaranteed by the Fifth Amendment; and it violates the Religious Freedom Restoration Act.

## JURISDICTION AND VENUE

3.      This action in which the United States is a defendant arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1346.

4.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 28 U.S.C. § 2000bb-1, and by the general legal and equitable powers of this Court.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants reside in this district and a substantial part of the acts giving rise to Plaintiffs' claims occurred in this district.

**PARTIES**

6.      Plaintiff Priests for Life is a nonprofit corporation that is incorporated under the laws of the State of New York.  It is recognized by the Internal Revenue Service as a Section 501(c)(3) organization.  Priests for Life is a religious organization.  And based on its sincerely held religious beliefs, Priests for Life objects to providing—directly or indirectly—any support for, or access to, contraception, sterilization, and abortifacients.

7.      Plaintiff Father Frank Pavone is an ordained, Roman Catholic priest and the National Director of Priests for Life.  Through Priests for Life and those who associate with Priests for Life for the purpose of advancing and promoting its religious mission, Fr. Pavone exercises his fundamental constitutional rights to the free exercise of religion, the freedom of speech, and expressive association.  Fr. Pavone objects to Defendants forcing Priests for Life to provide—directly or indirectly—any support for, or access to, contraception, sterilization, and abortifacients based on his sincerely held religious beliefs.  Fr. Pavone is currently covered under Priests for Life's health care plan.

8.      Plaintiff Alveda King, the niece of civil rights leader Martin Luther King, Jr., is a full-time employee of Priests for Life.  She is currently the Pastoral Associate and Director of African-American Outreach for Priests for Life and Gospel of Life Ministries.  She is also a

voice for the Silent No More Awareness Campaign, which is the world's largest mobilization of women and men who have lost children to abortion, sharing her testimony of two abortions, God's forgiveness, and healing.  Through Priests for Life and those who associate with Priests for Life for the purpose of advancing and promoting its religious mission, Plaintiff King exercises her fundamental constitutional rights to the free exercise of religion, the freedom of speech, and expressive association.  Plaintiff King objects to Defendants forcing Priests for Life to provide—directly or indirectly—any support for, or access to, contraception, sterilization, and abortifacients based on her sincerely held religious beliefs.

9.     Plaintiff King is currently covered under Priests for Life's health care plan, which is an "employer-sponsored" plan under the Affordable Care Act.  If Priests for Life were forced out of the health care market, Plaintiff King, as well as many other Priests for Life employees, including Plaintiff Morana, would be forced to purchase a costly, individual insurance plan as a result of the "individual mandate" provision of the Act.  This individual health care plan will necessarily include "contraceptive services" coverage because the mandate applies to individual plans.

10.    Plaintiff Janet Morana is a full-time employee of Priests for Life.  She is currently the Executive Director of Priests for Life, and she is the Co-Founder of the Silent No More Awareness Campaign.  Through Priests for Life and those who associate with Priests for Life for the purpose of advancing and promoting its religious mission, Plaintiff Morana exercises her fundamental constitutional rights to the free exercise of religion, the freedom of speech, and expressive association.  Plaintiff Morana objects to Defendants forcing Priests for Life to provide—directly or indirectly—any support for, or access to, contraception, sterilization, and abortifacients based on her sincerely held religious beliefs.

11.     Plaintiff Morana is covered under Priests for Life's health care plan, which is an "employer-sponsored" plan under the Affordable Care Act.  If Priests for Life were forced out of the health care market, Plaintiff Morana would be forced to purchase a costly, individual insurance plan as a result of the "individual mandate" provision of the Act.  This individual health care plan will necessarily include the immoral "contraceptive services" coverage because the mandate applies to individual plans.

12.     Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the contraceptive services mandate, which is the subject of this lawsuit.

13.     Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services (hereinafter "HHS").  In this capacity, she has responsibility for the operation and management of HHS.  Defendant Sebelius is sued in her official capacity only.

14.     Defendant Department of the Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the contraceptive services mandate, which is the subject of this lawsuit.

15.     Defendant Jacob J. Lew is the Secretary of the United States Department of the Treasury.  In this capacity, he has responsibility for the operation and management of the Department of the Treasury.  Defendant Lew is sued in his official capacity only.

16.     Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the contraceptive services mandate, which is the subject of this lawsuit.

17.     Defendant Thomas E. Perez is the Secretary of the United States Department of Labor.   In this capacity, he has responsibility for the operation and management of the Department of Labor.   Defendant Perez is sued in his official capacity only.

## FACTUAL ALLEGATIONS

### The Affordable Care Act

18.     In March 2010, President Obama signed into law the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), *amended by* Healthcare and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (hereinafter "Affordable Care Act" or "Act").

19.     The Affordable Care Act requires employers with 50 or more employees to provide federal government-approved health insurance or pay a substantial per-employee fine ("corporate mandate").   26 U.S.C. § 4980H.   The implementation of the "corporate mandate," which was required to take effect on January 1, 2014, has been delayed until 2015 by the Obama administration without congressional approval.

20.     The Affordable Care Act also requires, *inter alia*, each "applicable individual" to purchase health insurance ("individual mandate").   Individuals who fail to have "minimum essential coverage" required by this mandate must pay a monetary penalty.   *See* 26 U.S.C. § 5000A(b)(1).   The "individual mandate" takes effect on January 1, 2014.

### The Affordable Care Act — Not a Neutral Law of General Applicability

21.     To date, HHS has granted over 1,000 individualized waiver requests from employers and to insurance plans excusing their compliance with the Affordable Care Act.

22.     Certain provisions of the Act do not apply to members of certain religious groups. *See, e.g.*, 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members

of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); § 5000A(d)(2)(a)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).  None of these exceptions apply to Priests for Life.

23.     The contraceptive services mandate (described further below) does not apply to employers who provide so-called "grandfathered" health care plans.  The Affordable Care Act's default position is that an existing health care plan is not a grandfathered plan.

24.     Priests for Life's health care plan is not a grandfathered plan under the Affordable Care Act for multiple reasons, including, but not limited to, the following: (1) the health care plan does not include the required "disclosure of grandfather status" statement; (2) Priests for Life does not take the position that its health care plan is a grandfathered plan and thus does not maintain the records necessary to verify, explain, or clarify its status as a grandfathered plan nor will it make such records available for examination upon request; and (3) the health care plan has an increase in a percentage cost-sharing requirement measured from March 23, 2010.  *See* 42 U.S.C. § 18011(a)(2); 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. § 147.140.

25.     The Affordable Care Act is not generally applicable because, *inter alia*, it does not apply equally to all individuals and employers; because the Act provides for numerous exemptions from its provisions, including exemptions for some religious groups and for some religious beliefs, but not for others, including Priests for Life and its religious beliefs; and because HHS grants individualized waiver requests excusing some employers from complying with the provisions of the Act.

26.     The Affordable Care is not neutral because, *inter alia*, some groups, both secular and religious, enjoy exemptions from certain provisions of the Act, which others do not; because some groups, both secular and religious, have received waivers from complying with the provisions of the Act, while others have not.  Priests for Life is not eligible for any exemptions, and it is certainly not eligible for an exemption from the challenged contraceptive services mandate.  In fact, the mandate specifically targets for discriminatory treatment those religious groups such as Priests for Life that oppose providing coverage for, or access to, "contraceptive services" on the basis of their religious views.

27.     The Affordable Care Act favors certain religious organizations, beliefs, and practices, and it disfavors those religious organizations, such as Priests for Life, that oppose contraception, sterilization, and abortifacients on religious grounds.  Thus, the Affordable Care Act discriminates amongst similarly situated religious organizations on the basis of religious beliefs and practices.

**The Affordable Care Act — Development of the Contraceptive Services Mandate**

28.     The Affordable Care Act mandates that health insurers "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventative care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  42 U.S.C. § 300gg-13(a)(4).

29.     While organizations with fewer than fifty employees are not subject to the "corporate mandate" and are thus not required to provide health insurance for their employees under the Act, if such organizations do offer a health plan, they must comply with the contraceptive services mandate.  42 U.S.C. § 300gg-13.

30.     On July 19, 2010, HHS, along with the Department of Labor and the Department of the Treasury, published interim final regulations "implementing the rules for group health plans and health insurance coverage in the group and individual markets under provisions of the Patient Protection and Affordable Care Act regarding preventive health services."  75 Fed. Reg. 41726 (July 19, 2010).  Among other things, the interim final regulations required health insurers to cover preventive care for women as provided for in "guidelines supported by the Health Resources and Services Administration."  75 Fed. Reg. at 41759.

31.     HHS accepted public comments to the 2010 interim final regulations until September 17, 2010.  A large number of groups filed comments, warning of the potential conscience implications of requiring religious individuals and groups to pay for certain kinds of services, including contraception, sterilization, and abortion.

32.     HHS commissioned a study by a private health policy organization, the Institute of Medicine (hereinafter "IOM"), "to review what preventive services are necessary for women's health and well-being and should be considered in the development of comprehensive guidelines for preventive services for women."  (*See* http://www.hrsa.gov/womensguidelines).

33.     In conducting its study, IOM invited various pro-elective abortion groups and individuals to make presentations on the preventive care that should be provided by all health insurers, including the following: the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists, the National Women's Law Center, the National Women's Health Network, Planned Parenthood Federation of America, John Santelli, and Sara Rosenbaum.  (*See* http://www.nap.edu/openbook.php?record_id=13181&page=217).

34.     No religious groups or other groups that oppose government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.  (*See* http://www.nap.edu/openbook.php?record_id=13181&page=217).

35.     On July 19, 2011, IOM published a report of its study regarding preventive care for women.  Among other things, IOM recommended that preventive services include "[a]ll Food and Drug Administration approved contraceptive methods [and] sterilization procedures." (*See* Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps (2011)).

36.     Federal Drug Administration-approved contraceptive methods include, among other drugs, devices and procedures, birth control pills, prescription contraceptive devices, Plan B (also known as the "morning after pill"), and ulipristal (also known as "ella" or the "week after pill").

37.     Plan B and ella can prevent the implantation of a human embryo in the wall of the uterus and can cause the death of an embryo.  The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus or to cause the death of an embryo constitutes an "abortion."  Consequently, Plan B and ella are abortifacients.

38.     On August 1, 2011, HHS's Health Resources and Services Administration (hereinafter "HRSA") announced that it was supporting "the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines."  HRSA entitled the recommendations, "Women's Preventive Services: Required Health Plan Coverage Guidelines."  Among other things, HRSA's Guidelines include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  (*See* http://www.hrsa.gov/womensguidelines).

**The Affordable Care Act — Adoption of the Contraceptive Services Mandate**

39.     On August 3, 2011, HHS, along with the Department of Labor and the Department of the Treasury, published interim final regulations which, among other things, mandate that all health insurers "provide benefits for and prohibit the imposition of cost-sharing: . . . . With respect to women, preventive care and screening provided for in comprehensive guidelines supported by HRSA . . . which will be commonly known as HRSA's Women's Preventive Services: Required Health Plan Coverage Guidelines."  76 Fed. Reg. 46621 (Aug. 3, 2011); 45 C.F.R. § 147.130.

40.     Defendant Departments "determined that an additional opportunity for public comment would be impractical and contrary to the public interest" and promulgated the final regulation without waiting for public comment.

41.     The August 3, 2011, interim final regulations noted that "several commenters [to the July 19, 2010 interim final regulations] asserted that requiring group health plans sponsored by religious employers to cover contraceptive services that their faith deems contrary to its religious tenets would impinge upon their religious freedom."  Accordingly, as further noted in the regulations, "the Departments seek to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions. . . [T]he Departments are amending the interim final rules to provide HRSA additional discretion to exempt certain religious employees from the Guidelines where contraceptive services are concerned."  76 Fed. Reg. at 46623.

42.     For purposes of the discretionary exemption set forth in the August 3, 2011, interim final regulations, Defendants concluded that a "religious employer was one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its

religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii)."   76 Fed. Reg. at 46623; 45 C.F.R. § 147.130.

43.     Priests for Life did not qualify as a "religious employer" under this exemption.

44.     Although HHS accepted public comments to the 2011 interim final regulations until September 30, 2011, it went into effect immediately.

45.     Accordingly, health insurers were required to begin providing the mandated contraceptive services coverage in the first plan year (in the individual market, policy year) that began on or after August 1, 2012.

46.     The United States Conference of Catholic Bishops called for a rescission of the contraceptive services mandate, and, in the event HHS insisted on keeping the mandate, urged HHS to provide a broad and comprehensive conscience exemption for all of those persons and organizations that objected to the mandate—not just the extremely small subset of "religious employers" that HHS proposed to exempt initially.

47.     On January 20, 2012, Defendant Sebelius announced that: "Nonprofit employers who, based on religious beliefs do not currently provide contraceptive coverage in their insurance plan, will be provided an additional year, until August 1, 2013, to comply with the new law."  She further announced that: "We intend to require employers that do not offer coverage of contraceptive services to provide notice to employees, which will also state that contraceptive services are available at sites such as community health centers, public clinics, and hospitals with income-based support."  (*See* http://www.hhs.gov/news/press/2012pres/01/20120120a.html).

48.     On February 10, 2012, President Obama announced that his administration intended to propose and finalize a new regulation that "will require insurance companies to cover

contraception if the [non-exempted] religious organization chooses not to. . . .   Contraception coverage will be offered to women by their employers' insurance companies directly, with no role for religious employers who oppose contraception."  (*See* http://www.whitehouse.gov/the-press-office/2012/02/10/fact-sheet-women-s-preventive-services-and-religious-institutions).

49.    In conjunction with the President's announcement, Defendants created a "temporary enforcement safe harbor," which is a self-imposed stay of enforcement of the contraceptive services mandate for certain qualified organizations.  This "safe harbor" would remain in effect for the qualified organization until its first plan year that began on or after August 1, 2013.  *See* HHS, Guidance on Temporary Enforcement Safe Harbor (Feb. 10, 2012); 77 Fed. Reg. 16501, 16504 (Mar. 21, 2012).

50.    The "temporary enforcement safe harbor" applied if (1) the organization is a non-profit; (2) "[f]rom February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan sponsored by the organization"; (3) "[t]he group health plan sponsored by the organization . . . provides to plan participants a prescribed notice indicating that the plan will not provide contraceptive coverage for the first plan year beginning on or after August 1, 2012"; and (4) "[t]he organization self-certifies that it satisfies the three criteria above, and documents its self-certification in accordance with prescribed procedures."  *See* HHS, Guidance on Temporary Enforcement Safe Harbor (Feb. 10, 2012).

51.    On August 15, 2012, Defendants issued additional guidance clarifying the scope of the "temporary enforcement safe harbor."  Under this additional guidance, so long as an otherwise qualified organization "took some action to try to exclude or limit such coverage that was not successful as of February 10, 2012," the organization could still qualify for the safe

harbor even if it provided contraceptive coverage after February 10, 2012. *See* HHS, Guidance on Temporary Enforcement Safe Harbor (Aug. 15, 2012).

52. The "compromise" announced by President Obama on February 10, 2012, was promptly rejected by the Catholic Bishops because it to failed to protect religious freedom and the right to conscience.

53. Defendants rejected considering a "broader exemption" from the challenged mandate because they believe that such an exemption "would lead to more employees having to pay out of pocket for contraceptive services, *thus making it less likely that they would use contraceptives*, which would undermine the benefits [of requiring the coverage]." According to Defendants, "Employees that do not primarily employ employees who share the religious tenets of the organization are more likely to employ individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives. Including these employers within the scope of the exemption *would subject their employees to the religious views of the employer*, limiting *access* to contraceptives, and *thereby inhibiting the use of contraceptive services* and the benefits of preventive care." 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012) (emphasis added).

54. Thus, the ultimate goal of Defendants is to increase the "use of contraceptive services" by compelling access to these services and to ensure that employees, including employees of religious organizations such as Priests for Life, are not "subject" to the employer's religious beliefs regarding such "services." Thus, Defendants' objective is in direct conflict with Priests for Life's goals and religious mission.

55. Consequently, despite beginning the process of amending the regulations by publishing an Advance Notice of Proposed Rule Making in the Federal Register, *see* 77 Fed.

Reg. 16501 (Mar. 21, 2012), Defendants made it clear from the very beginning that they did not intend to provide a "broader exemption" that would in any way "inhibit[] the use of contraceptive services" by employees or "subject . . . employees to the religious views of the employer."  In short, Defendants did not intend to extend the exemption from the mandate to organizations such as Priests for Life in a manner that would protect and respect Priests for Life's religious beliefs and convictions, as well as those who work for and associate with Priests for Life, such as Fr. Pavone and Plaintiffs King and Morana.

56.  Indeed, according to Defendants, they were intent on developing "alternative ways of providing contraceptive coverage" that would require "contraceptive coverage directly to the employer's plan participants (and their beneficiaries) who desire it," claiming that there would "be no charge for the contraceptive coverage."  77 Fed. Reg. at 8728.

57.  Thus, even under this proposed regulation, which would soon become final (as discussed below), Priests for Life would still be purchasing a health care plan that provides "contraceptive coverage directly to [its] plan participants (and their beneficiaries)," which is unacceptable to Priests for Life.  Indeed, Priests for Life would still be paying for a health care plan that provides these immoral services "directly to" its employees in violation of Priests for Life's sincerely held religious beliefs.  And as Defendants' proposed regulations made clear, the government is purposefully and intentionally inserting itself into Priests for Life's business practices so that, according to the government, Priests for Life's employees would not be "subject" to Priests for Life's "religious views," thereby directly undermining and interfering with Priests for Life's religious beliefs and practices.

58.  While Defendant Sebelius claimed that women may pay up to $600 per year for contraceptive services, she asserted that insurers could provide those services to covered

employees at no cost because "on balance, preventive services around family planning, avoiding what may be unhealthy pregnancies, avoiding the health consequences of that actually is a cost reducer."

59.     However, insurance companies do not donate products and services to covered employees.  Drug makers will still charge insurers for birth control pills, IUD's, and other contraceptive devices.  Doctors will still bill insurers for reproductive treatment.  The reality, as with all mandated benefits, is that these costs will be borne eventually via higher premiums. Insurers may amortize the cost differently over time, but eventually prices will find equilibrium. Thus, Priests for Life will still pay for contraceptive services, including abortifacients, even if it is nominally carried by a third-party corporation—its health insurance provider.

**Final Rules on Contraceptive Coverage and Religious Organizations**

60.     On June 28, 2013, the Obama administration announced that it had issued final rules on contraceptive coverage and religious organizations.  These final rules were published in the Federal Register on July 2, 2013 and became effective on August 1, 2013.  78 Fed. Reg. 39870 (July 2, 2013).

61.     With the exception of the amendments to the religious employer exemption, which apply to group health plans and health insurance issuers for plan years beginning on or after August 1, 2012, these final regulations apply to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014.   78 Fed. Reg. at 39870. Accordingly, Defendants extended the "temporary enforcement safe harbor" to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014.  78 Fed. Reg. at 39872.

62.     Pursuant to these final regulations, the definition of "religious employer" for purposes of the only exemption from the contraceptive services mandate that provides

meaningful protection for religious liberty and the right of conscience (*i.e.*, it exempts the organization from having to provide any offending coverage) was narrowed.  While the revised definition did eliminate three criteria from the earlier definition of "religious employer" for purposes of this exemption, it ultimately includes only those organizations that fall under Section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  78 Fed. Reg. at 39874.  These organizations are essentially churches and religious orders—a very narrow class of nonprofit organizations.

63.    Priests for Life, while a nonprofit religious organization, does not qualify for this narrow exemption.  Consequently, Defendants revised the religious employer exemption by not expanding it for organizations such as Priests for Life, but by excluding such organizations altogether.

64.    The earlier definition of "religious employer" included nonprofit organizations described in section 6033(a)(1) of the Code, which includes religious organizations such as Priests for Life.  However, Priests for Life was not eligible for the earlier exemption because of the other criteria that are now removed by these final rules.

65.    The final rules also provide a so-called "accommodation" for certain "eligible organizations."  An "eligible organization" is an organization that satisfies all of the following requirements: (1) the organization opposes providing coverage for some or all of any contraceptive services required to be covered by the challenged mandate on account of religious objections; (2) the organization is organized and operates as a nonprofit entity; (3) the organization holds itself out as a religious organization; and (4) the organization self-certifies, in a form and manner specified by HHS, that it satisfies the criteria in (1) through (3) above, and makes such self-certification available for examination upon request by the first day of the first

plan year to which the "accommodation" applies.  This self-certification must be executed by a person authorized to make the certification on behalf of the organization, and the organization must retain a record of this self-certification.

66.     A group health plan established or maintained by an "eligible organization" that provides benefits through one or more group health insurance issuers complies with the "eligible organization" requirements by furnishing a copy of the self-certification to each issuer that would otherwise provide coverage in connection with the group health plan.  An issuer may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status.

67.     A group health plan issuer who receives a copy of the self-certification must: (1) exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and (2) provide separate payments for any contraceptive services required to be covered for plan participants and beneficiaries so long as they remain enrolled in the plan.  With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.  The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services.

68.     For each plan year to which the "accommodation" applies, an issuer required to provide payments for contraceptive services must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials

distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the issuer provides separate payments for contraceptive services, and must provide contact information for questions and complaints.

69.     Consequently, because Priests for Life provides its employees with a health care plan, the government mandate forces Priests for Life to provide the means and mechanism by which contraception, sterilization, and abortifacients are provided to its employees, which is unacceptable to Plaintiffs because it violates their sincerely held religious beliefs.

70.     There is no logical or moral distinction between the extant contraceptive services mandate, with its limited religious employer exemption, and the "accommodation" for certain "eligible organizations." Employers who offer health insurance do not pay for individual benefits and products as they are provided. Rather, they pay a premium for a policy that gives their employees access to covered benefits and products when they need them. Under the "accommodation," all non-exempted health plans must necessarily include contraceptive services among their covered benefits. Consequently, religious employers, such as Priests for Life, are still paying an insurer to provide their employees with access to a product (*i.e.,* contraceptives, sterilization, and abortifacients) that violates their religious convictions.

### Priests for Life — Mission

71.     Priests for Life is a private association of the faithful, recognized and approved under the Canon Law of the Catholic Church. It works in harmony with the goals of the Bishops' Pro-Life Committee and the local diocesan respect life offices.

72.     Priests for Life was founded in 1991 to do one of the most important tasks in the Church today: to help spread the Gospel of Life.

73.     The mission of Priests for Life is to unite and encourage all clergy to give special emphasis to the life issues in their ministry.  It also seeks to help them take a more vocal and active role in the pro-life movement.  Priests for Life exists to fight the culture of death. Contraception, sterilization, abortifacients, and abortion all promote and support the culture of death and are therefore immoral and antithetical to Priests for Life's religious mission.

74.     Pursuant to its Mission Statement, Priests for Life seeks to: (1) unite, encourage, and provide ongoing training to priests and deacons who give a special emphasis to the "life issues," especially abortion and euthanasia, in their ministries; (2) instill a sense of urgency in all clergy to teach about these issues and to mobilize their people to help stop abortion and euthanasia; (3) assist clergy and laity to work together productively for the cause of life; and (4) provide ongoing training and motivation to the entire pro-life movement.

75.     Priests for Life offers a wide range of audios, videos, and brochures, and regularly uses the media of television, radio, and the printed press to spread the message of life.

76.     Fr. Pavone, the National Director of Priests for Life, and his associates travel the country full time to meet with priests, pro-life groups, and others to express, teach, and spread the Gospel of Life.  This is a religious exercise for Fr. Pavone.

77.     The Gospel of Life promotes the culture of life, which opposes contraception, sterilization, abortifacients, and abortion.

78.     Through his expressive association with Priests for Life, Fr. Pavone spreads the Gospel of Life.

79.     Fr. Pavone is the "face" of Priests for Life, and he uses the media of television, radio, and the printed press to spread Priests for Life's message of life.  For example, Fr. Pavone hosts the Defending Life television series on the Eternal Word Television Network (EWTN). Through his media appearances and other expressive activities, Fr. Pavone promotes the culture of life and actively opposes the culture of death, which supports and promotes the use of contraception, sterilization, abortifacients, and abortion.

80.     Plaintiff King uses the media of television, radio, and the printed press to spread Priests for Life's message of life.  Through her expressive association with Priests for Life, Plaintiff King spreads the Gospel of Life.  This is a religious exercise for Plaintiff King. Through her media appearances and other expressive activities, Plaintiff King promotes the culture of life and actively opposes the culture of death.

81.     Plaintiff Morana uses the media of television, radio, and the printed press to spread Priests for Life's message of life.  She is featured on Fr. Pavone's Defending Life television series and is the Co-host of the The Catholic View for Women, also seen on EWTN. Plaintiff Morana is a weekly guest on EWTN Global Catholic Radio with Teresa Tomeo and numerous other media outlets.  Through her expressive association with Priests for Life, Plaintiff Morana spreads the Gospel of Life.  This is a religious exercise for Plaintiff Morana.  Through her media appearances and other expressive activities, Plaintiff Morana promotes the culture of life and actively opposes the culture of death.

82.     Priests for Life also represents a family of ministries that reach and enrich every aspect of the pro-life movement, for clergy and laity alike, in a wide variety of activities, including direct ministries to priests, deacons, and seminarians; youth outreach; healing

ministries; broadcasting; prayer campaigns; education regarding public policy; and facilitating relationships among pro-life organizations and leaders.

83.     In sum, Priests for Life provides a wide range of services to both Catholics and non-Catholics as part of its pro-life ministry, and it engages in a wide-range of expressive, religious activity to further its pro-life mission.  Through their association with Priests for Life, Fr. Pavone and Plaintiffs King and Morana express a pro-life message to further Priests for Life's pro-life mission.

84.     Indeed, an individual's freedom to speak and to worship could not be vigorously protected from interference by the government unless a correlative freedom to engage in a group effort toward those ends were not also guaranteed.  This freedom to associate is an indispensable means of preserving individual liberties such as the freedom of speech and the free exercise of religion.  By subjecting Priests for Life to the contraceptive services mandate as set forth in this Complaint, Defendants are infringing upon the constitutional freedoms of Fr. Pavone and Plaintiffs King and Morana, who associate with Priests for Life for purposes of promoting the culture of life through speech and religious activities protected by the First Amendment.

### Plaintiffs' Sincerely Held Religious Beliefs Regarding Contraceptive Practices and Abortion

85.     A deep devotion to the Catholic faith is central to the mission of Priests for Life.

86.     Priests for Life holds and actively professes religious beliefs that include traditional Christian teaching on the nature and purpose of human sexuality.  In particular, in accordance with Pope Paul VI's 1968 encyclical *Humanae Vitae*, Priests for Life believes that human sexuality has two primary purposes: to "most closely unit[e] husband and wife" and "for the generation of new lives."  Priests for Life believes and actively professes the Catholic Church teaching that "[t]o use this divine gift destroying, even if only partially, its meaning and purpose

is to contradict the nature both of man and of woman and of their most intimate relationship, and therefore it is to contradict also the plan of God and His Will."  Therefore, Priests for Life believes and teaches that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means"— including contraception and sterilization—is a grave sin.

87.     Plaintiffs believe, as Pope Paul VI prophetically stated in *Humanae Vitae*, that "man, growing used to the employment of anticonceptive practices, may finally lose respect for the woman and, no longer caring for her physical and psychological equilibrium, may come to the point of considering her as a mere instrument of selfish enjoyment, and no longer as his respected and beloved companion."  Consequently, Plaintiffs believe that the contraceptive services mandate harms women.

88.     Priests for Life holds and actively professes religious beliefs that include traditional Christian teaching on the sanctity of life.  It believes and teaches that each human being bears the image and likeness of God, and therefore all human life is sacred and precious from the moment of conception.  Consequently, Priests for Life believes and teaches that abortion ends a human life and is a grave sin.

89.     Further, Priests for Life subscribes to authoritative Catholic teaching about the proper nature and aims of health care and medical treatment.  For example, Priests for Life believes, in accordance with Pope John Paul II's 1995 encyclical *Evangelium Vitae*, that "'[c]ausing death' can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life."

90.     Based on the teachings of the Catholic Church, and its own sincerely held beliefs, Priests for Life does not believe that contraception, sterilization, abortifacients, or abortion are properly understood to constitute medicine, health care, or a means of providing for the well-being of persons.  Indeed, Priests for Life believes these procedures involve gravely immoral practices.

91.     As part of its religious ministry, Priests for Life promotes the culture of life by directly and emphatically opposing the use of contraceptives, sterilization practices, abortifacients, and abortion.  According to Priests for Life's sincerely held religious beliefs, contraception, sterilization, abortifacients, and abortion are not morally neutral.  Consequently, Priests for Life actively opposes the use of such immoral drugs and procedures.

92.     Fr. Pavone and Plaintiffs King and Morana share Priests for Life's sincerely held religious beliefs described in this Complaint.

### Priests for Life — Employee Health Insurance

93.     As part of its commitment to Catholic social teaching, Priests for Life promotes the health and well-being of its employees.  In furtherance of this commitment, Priests for Life provides health insurance for its employees.

94.     Priests for Life ensures that its insurance policies do not cover, promote, or provide access to drugs, devices, services, or procedures inconsistent with its faith, including contraception.

95.     Priests for Life cannot provide health insurance that supports—directly or indirectly—artificial contraception, sterilization, abortifacients, abortion, or related education and counseling without violating its sincerely held religious beliefs.

96.     Priests for Life cannot provide health insurance that provides access to and makes available contraception, sterilization, abortifacients, abortion, or related education and counseling without violating its sincerely held religious beliefs.

97.     Priests for Life cannot provide information or guidance to its employees about other locations at which they can access artificial contraception, sterilization, abortifacients, abortion, or related education and counseling without violating its sincerely held religious beliefs.

98.     In short, Priests for Life cannot comply with the contraceptive services mandate and its so-called "accommodation" without violating its sincerely held religious beliefs.

99.     Priests for Life is funded solely through tax-deductible donations.  Donors who give to Priests for Life do so with an understanding of Priest for Life's mission and with the assurance that Priests for Life will continue to adhere to, disseminate, and report reliable Catholic teaching on the sanctity of life and human sexuality.

100.    Priests for Life cannot use donated funds for purposes known to be morally repugnant to its donors and in ways that would violate the implicit trust of the purpose for their donations.

101.    Priests for Life's next plan year will commence on January 1, 2014.

**Priests for Life — Harm Caused by the Imposition of the Challenged Mandate**

102.    Because of the contraceptive services mandate, including the so-called "accommodation," Priests for Life must now make business decisions that will affect its ability to continue the services it provides.  As a nonprofit organization, Priests for Life funds its operations almost entirely through tax-deductible donations, including planned giving.  Priests for Life must make business decisions now based on what it expects to receive in donations in

the future.  This requires Priests for Life to look several years ahead to determine what its budget will be and thus what services it will be capable of providing.  Priests for Life's donors will not support an organization that provides its employees with access to contraception, sterilization, or abortifacients—practices that run counter to Priests for Life's mission, goals, and message—the very basis for the donations in the first instance.

103.    Indeed, the current mandate with its limited religious employer exemption and so-called "accommodation" will force Priests for Life out of the market for health care services and thus adversely affect it as an organization.  Many of Priests for Life's valued employees, without whom Priests for Life could not provide its much needed services, will be forced to leave Priests for Life and seek other employment that provides health care benefits.

104.    The contraceptive services mandate is causing Priests for Life to feel economic and moral pressure today as a result of the government imposing substantial burdens on the religious beliefs and practices of Priests for Life.

105.    In sum, Priests for Life, a Catholic organization, is morally prohibited based on its sincerely held religious convictions from cooperating with evil.  Priests for Life objects to being forced by the government to purchase a health care plan that provides its employees with access to contraceptives, sterilization, and abortifacients, all of which are prohibited by its religious convictions.  This is true whether the immoral services are paid for directly, indirectly, or even not at all by Priests for Life.  Contraception, sterilization, and abortifacients are immoral regardless of their cost.  And Priests for Life objects to the government forcing it into a moral dilemma with regard to its relationship with its employees and its very survival as an effective, pro-life organization.

## FIRST CLAIM FOR RELIEF

### (Free Exercise of Religion — Violation of the First Amendment)

106.    Plaintiffs hereby incorporate by reference all stated paragraphs set forth herein.

107.    The contraceptive services mandate, as set forth in this Complaint, violates the Free Exercise Clause of the First Amendment to the United States Constitution.

108.    Plaintiffs' sincerely held religious beliefs prohibit them from promoting or supporting—directly or indirectly—contraception, sterilization, abortifacients, abortion, and related education and counseling, including providing a health care plan that provides access to or the means of acquiring such immoral services.  Plaintiffs' compliance with these beliefs is a religious exercise.

109.    The contraceptive services mandate, as set forth in this Complaint, substantially burdens Plaintiffs' sincerely held religious beliefs.

110.    The contraceptive services mandate, as set forth in this Complaint, creates government-imposed coercive pressure on Plaintiffs to change or violate their sincerely held religious beliefs.

111.    The contraceptive services mandate, as set forth in this Complaint, exposes Priests for Life to significant competitive disadvantage, in that it will no longer be able to offer its employees health insurance.

112.    The contraceptive services mandate, as set forth in this Complaint, does not further any compelling governmental interest.

113.    The contraceptive services mandate, as set forth in this Complaint, is not the least restrictive means to accomplish any permissible governmental interest.

27

114.    The contraceptive services mandate, as set forth in this Complaint, is a restriction on the free exercise of religion which is not narrowly tailored to advance any permissible governmental interest.

115.    The contraceptive services mandate, as set forth in this Complaint, is not a neutral law of general applicability.

116.    Notwithstanding its receipt of multiple objections to the contraceptive services mandate on the basis that it would violate sincerely held religious beliefs, Defendants designed that requirement and its religious employer exemption and "accommodation" in a way that makes it impossible for Plaintiffs to comply with their religious beliefs.

117.    By design, the contraceptive services mandate, as set forth in this Complaint, is imposed on some religious organizations, but not others, resulting in discrimination among religions.

118.    The contraceptive services mandate, as set forth in this Complaint, is official government action that targets religious conduct and beliefs for distinctive, discriminatory, and adverse treatment.

119.    Defendants promulgated the contraceptive services mandate, as set forth in this Complaint, to adversely target and suppress the right to free exercise of religion of religious organizations such as Priests for Life.

120.    Defendants' violation of Plaintiffs' right to free exercise of religion has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

## SECOND CLAIM FOR RELIEF

### (Violation of the Religious Freedom Restoration Act)

121.    Plaintiffs hereby incorporate by reference all stated paragraphs set forth herein.

122.    The contraceptive services mandate, as set forth in this Complaint, violates the Religious Freedom Restoration Act.  42 U.S.C. § 2000bb, *et seq*.

123.    Plaintiffs' sincerely held religious beliefs prohibit them from promoting or supporting—directly or indirectly—contraception, sterilization, abortifacients, abortion, and related education and counseling, including providing a health care plan that provides access to or the means of acquiring such immoral services.  Plaintiffs' compliance with these beliefs is a religious exercise.

124.    The contraceptive services mandate, as set forth in this Complaint, substantially burdens Plaintiffs' sincerely held religious beliefs.

125.    The contraceptive services mandate, as set forth in this Complaint, does not further any compelling governmental interest.

126.    The contraceptive services mandate, as set forth in this Complaint, is not the least restrictive means to accomplish any permissible governmental interest.

127.    Defendants' violation of the Religious Freedom Restoration Act has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

**THIRD CLAIM FOR RELIEF**

**(Freedom of Speech and Expressive Association — Violation of the First Amendment)**

128.    Plaintiffs hereby incorporate by reference all stated paragraphs set forth herein.

129.    The contraceptive services mandate, as set forth in this Complaint, violates Plaintiffs' right to freedom of speech and expressive association guaranteed by the First Amendment to the United States Constitution.

130.    The contraceptive services mandate, as set forth in this Complaint, compels Priests for Life to subsidize and/or provide access to education and counseling regarding

29

contraceptive methods, sterilization procedures, and abortifacients in violation of its sincerely held religious beliefs.

131.    The contraceptive services mandate, as set forth in this Complaint, compels Priests for Life to engage in speech that is contrary to its sincerely held religious beliefs and contrary to the message that Fr. Pavone and Plaintiffs King and Morana express on behalf of Priests for Life pursuant to their association with the pro-life organization.

132.    By subjecting Priests for Life to the contraceptive services mandate as set forth in this Complaint, Defendants are infringing upon the constitutional freedoms of Fr. Pavone and Plaintiffs King and Morana, who associate with Priests for Life for purposes of promoting the culture of life through speech and religious activities protected by the First Amendment.

133.    The contraceptive services mandate, as set forth in this Complaint, is not narrowly tailored to advance a compelling governmental interest.

134.    Defendants promulgated the contraceptive services mandate, as set forth in this Complaint, with the intent and purpose to harm the pro-life speech of religious organizations and individuals such as Plaintiffs.

135.    Defendants' violation of Plaintiffs' right to free speech and expressive association has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

<b>FOURTH CLAIM FOR RELIEF</b>

<b>(Establishment Clause — Violation of the First Amendment)</b>

136.    Plaintiffs hereby incorporate by reference all stated paragraphs set forth herein.

137.    By favoring some religious beliefs and practices, but disfavoring those sincerely held religious beliefs and practices of Plaintiffs, Defendants have violated the Establishment Clause of the First Amendment.

30

138.    The contraceptive services mandate, as set forth in this Complaint, lacks a secular purpose, has the primary effect of inhibiting religion, and creates excessive entanglement with religion in violation of the Establishment Clause.

139.    The contraceptive services mandate, as set forth in this Complaint, conveys an impermissible, government-sponsored message of disapproval of and hostility toward the Catholic Church and Catholic religious beliefs and practices.   As a result, Defendants' contraceptive services mandate sends a clear message to Plaintiffs and others who are adherents to the Catholic faith that they are outsiders, not full members of the political community and an accompanying message that those who oppose the Catholic Church and Catholic religious beliefs and practices by accepting and promoting contraceptive services, are insiders, favored members of the political community, in violation of the Establishment Clause.

140.    Defendants' violation of the Establishment Clause has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

## FIFTH CLAIM FOR RELIEF

### (Equal Protection — Violation of the Fifth Amendment)

141.    Plaintiffs hereby incorporate by reference all stated paragraphs set forth herein.

142.    By exempting some religious organizations from the requirements of the Affordable Care Act and its contraceptive services mandate on the basis of religious beliefs and practices, but forcing Priests for Life to comply in violation of its sincerely held religious beliefs, Defendants have deprived Plaintiffs of the equal protection of the law guaranteed under the Fifth Amendment to the United States Constitution.

143.    By favoring some religious beliefs and practices, but disfavoring those sincerely held religious beliefs and practices of Plaintiffs, Defendants have deprived Plaintiffs of the equal protection of the law guaranteed under the Fifth Amendment.

144.    The contraceptive services mandate, as set forth in this Complaint, discriminates amongst similarly situated religious organizations on the basis of religious beliefs and practices in violation of the equal protection guarantee of the Fifth Amendment.

145.    Defendants' violation of the Fifth Amendment has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

A.    That this Court declare that the contraceptive services mandate, as set forth in this Complaint, violates the First and Fifth Amendments to the United States Constitution and the Religious Freedom Restoration Act;

B.    That this Court preliminarily and permanently enjoin the contraceptive services mandate, as set forth in this Complaint;

C.    That this Court award Plaintiffs their reasonable costs, including attorney's fees, pursuant to 28 U.S.C. § 2412, 5 U.S.C. § 504, 42 U.S.C. § 2000bb-1, and the general legal and equitable powers of this Court;

D.    That this Court grant such other and further relief as it deems equitable and just under the circumstances.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ Robert J. Muise
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
rmuise@americanfreedomlawcenter.org

/s/ David Yerushalmi
David Yerushalmi, Esq. (DC Bar No. 978179)
1901 Pennsylvania Avenue NW
Suite 201
Washington, D.C. 20006
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Counsel for Plaintiffs*