**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                    )
PRIESTS FOR LIFE, et al.,           )
                                    )
              Plaintiffs,           )
                                    )
         v.                         )   Civil Action No. 13-1261 (EGS)
                                    )
UNITED STATES DEPARTMENT OF         )
HEALTH AND HUMAN SERVICES,          )
et al.                              )
                                    )
              Defendants.           )
_____ )
```

**MEMORANDUM OPINION**

This case presents one of many challenges to the
contraceptive services mandate of the Affordable Care Act
("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010). A number of
circuits, including the District of Columbia Circuit, have
examined the mandate's requirements regarding contraceptive
coverage for employees of for-profit companies; that issue is
now pending before the Supreme Court. See *Hobby Lobby Stores,
Inc. v. Sebelius*, 723 F.3d 1114, (10th Cir. 2013) (en banc),
*cert. granted*, 2013 U.S. LEXIS 8418 (U.S. Nov. 26, 2013) (Case
No. 13-354); *Conestoga Wood Specialties Corp. v. Sebelius*, 724
F.3d 377 (3d Cir. 2013), *cert. granted*, 2013 U.S. LEXIS 8418
(U.S. Nov. 26, 2013) (No. 13-354); *see also, e.g., Gilardi v.
United States Dep't of Health and Human Services*, 733 F.3d 1208
(D.C. Cir. 2013).

The instant case presents a different issue: the obligations, *vel non*, of non-profit religious organizations to provide contraceptive coverage under the mandate. These organizations are eligible for an accommodation to the mandate; specifically, they are not required to provide contraceptive coverage to their employees if they object to doing so on religious grounds. Under the regulations, an employer in this situation can self-certify to its health insurance issuer that it has a religious objection to providing coverage for contraceptive services as part of its health insurance plan. Once the issuer receives the self-certification, the non-profit organization is exempt from the mandate. The organization's employees will receive coverage for contraceptive services, but that coverage will be provided directly through the issuer. The coverage is excluded from the employer's plan of benefits, and the issuer assumes the full costs of coverage; it is prohibited from charging any co-payments, deductibles, fees, premium hikes or other costs to the organization or its employees.

Priests for Life, a non-profit organization which takes a "vocal and active role in the pro-life movement," Complaint ¶ 73, and three of its employees have filed this lawsuit objecting to the accommodation to the mandate. They allege that the self-certification Priests for Life must provide to its issuer violates their rights under the Religious Freedom Restoration

Act, 42 U.S.C. §§ 2000bb, et seq. ("RFRA"), and the First and
Fifth Amendments to the Constitution.

The Supreme Court has made clear that religious exercise is
impermissibly burdened when government action compels
individuals "to perform acts undeniably at odds with fundamental
tenets of their religious beliefs." *Wisconsin v. Yoder*, 406
U.S. 205, 218 (1972). At the same time, acts of third parties,
which do not cause adherents to act in violation of their
religious beliefs, do not constitute an impermissible burden.
*Kaemmerling v. Lappin,* 553 F.3d 669, 678 (D.C. Cir. 2008). The
right to religious freedom "simply cannot be understood to
require the Government to conduct its [] affairs in ways that
comport with the religious beliefs of particular citizens."
*Bowen v. Roy*, 476 U.S. 693, 699 (1986). Religious freedom is
protected "in terms of what the government cannot do to the
individual, not in terms of what the individual can exact from
the government." *Lyng v. N'west Indian Cemetery Protective
Assn.*, 485 U.S. 439, 451 (1988) (citations omitted).

Plaintiffs here do not allege that the self-certification
itself violates their religious beliefs. To the contrary, the
certification states that Priests for Life is opposed to
providing contraceptive coverage, which is consistent with those
beliefs. Indeed, during oral argument, plaintiffs stated that
they have no religious objection to filling out the self-

3

certification; it is the issuer's subsequent provision of coverage to which they object. But filling out the form is all that the ACA requires of the plaintiffs in this case.

There is no doubt that the plaintiffs find the statute's requirement that the issuer provide contraceptive coverage profoundly opposed to their religious scruples. But the issuer's provision of coverage is just that -- an entirely third party act. The *issuer's* provision of coverage does not require *plaintiffs* to "perform acts" at odds with their beliefs. *Yoder*, 406 U.S. at 218. Accordingly, the accommodations to the contraceptive services mandate do not violate their religious rights.

Pending before the Court is the plaintiffs' motion for summary judgment and the defendants' cross motion to dismiss or in the alternative for summary judgment. Upon consideration of the motions, the oppositions and replies thereto, the *Amicus Curiae* brief of the American Civil Liberties Union, the entire record, and for the reasons explained below, defendants' motion to dismiss is **GRANTED;** accordingly, the parties' motions for summary judgment are hereby **DENIED AS MOOT**.

I.    **BACKGROUND**

Priests for Life is a non-profit corporation incorporated in the State of New York, and Father Frank Pavone, Alveda King, and Janet Morana are among its employees. Compl. ¶¶ 6-11. "A

deep devotion to the Catholic faith is central to the mission of
Priests for Life." Compl. ¶ 85.  Its mission is to "unite and
encourage all clergy to give special emphasis to the life issues
in their ministry . . . [and] to help them take a more vocal and
active role in the pro-life movement."  Compl. ¶ 73.
Accordingly, "contraception, sterilization, abortifacients[1] and
abortion . . . are immoral and antithetical to Priests for
Life's religious mission."  *Id*.  Priests for Life provides
health insurance for its employees.  Compl. ¶ 93.  The next plan
year will commence on January 1, 2014.  Compl. ¶ 101.

Plaintiffs' claims arise out of certain regulations
promulgated in connection with the ACA.  The Act requires all
group health plans and health insurance issuers that offer non-
grandfathered group or individual health coverage to provide
coverage for certain preventive services without cost-sharing,
including, for "women, such additional preventive care and
screenings . . . as provided for in comprehensive guidelines
supported by the Health Resources and Services Administration
[("HRSA")]."  42 U.S.C. § 300gg-13(a)(4).  The HRSA, an agency
within the Department of Health and Human Services ("HHS"),
commissioned the Institute of Medicine ("IOM") to conduct a

---

[1] Plaintiffs use the word "abortifacient" to refer to drugs such
as Plan B and Ella that they allege cause abortions. *See, e.g.*,
Compl. ¶ 37.  Plaintiffs do not allege that the regulations will
require them to provide insurance coverage for the medical
procedure of abortion.

study on preventive services. On August 1, 2011, HRSA adopted IOM's recommendation to include "all Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." *See* HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines ("HRSA Guidelines"), *available at* http://www.hrsa.gov/womensguidelines/ (last visited Dec. 17, 2013).

Several exemptions and safe-harbor provisions excuse certain employers from providing group health plans that cover women's preventive services as defined by HHS regulations. First, the mandate does not apply to certain "grandfathered" health plans in which individuals were enrolled on March 23, 2010, the date the ACA was enacted. 75 Fed. Reg. 34,538 (June 17, 2010). Second, certain "religious employers" are excluded from the mandate. *See, e.g.*, 76 Fed. Reg. 46,621 (Aug. 3, 2011); 45 C.F.R. § 147.130(a)(1)(iv)(A). On June 28, 2013, the government issued final rules on contraceptive coverage and religious organizations; the rules became effective August 1, 2013. 78 Fed. Reg. 39,870 (July 2, 2013). These regulations are the subject of this case.

Under the final regulations, a "religious employer" exempt from the contraceptive services mandate is "an organization that is organized and operates as a nonprofit entity and is referred

to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code," which refers to churches, their integrated auxiliaries, and conventions or associations of churches, and the exclusively religious activities of any religious order. 45 C.F.R. § 147.131(a). Non-profit organizations which do not qualify for this exemption may, however, qualify for an accommodation with respect to the contraceptive coverage requirement if they are "eligible organizations" under the regulations. An "eligible organization" must satisfy the following criteria:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
(2) The organization is organized and operates as a non-profit entity.
(3) The organization holds itself out as a religious organization.
(4) The organization self-certifies, in the form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (1) through (3), and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation applies.

45 C.F.R. § 147.131(b); *see also* 78 Fed. Reg. at 39,874-75.

Once an eligible organization provides a copy of a self-certification to its issuer, which provides coverage in connection with the group health plan, the organization is relieved of its obligation "to contract, arrange, pay or refer for contraceptive coverage" to which it has religious

objections. 78 Fed. Reg. at 39,874. The group health plan
issuer which receives the self-certification form must (1)
exclude contraceptive coverage from the group health insurance
coverage provided in connection with the group health plan, and
(2) provide separate payments for any contraceptive services
required to be covered for plan participants and beneficiaries.
The issuer may not impose any cost-sharing requirements (such as
a copayment, coinsurance or a deductible) on plan participants
or beneficiaries. 78 Fed. Reg. at 39,896. Likewise, the issuer
is prohibited from imposing any premium, fee, or other charge,
or any portion thereof, directly or indirectly, on the eligible
organization or the group health plan. *Id.* Failure to self-
certify or otherwise comply with the mandate will result in
Priests for Life's issuer including contraceptive services
within Priests for Life's healthcare policy, and charging the
organization for such coverage.[2]

---

[2] During the initial briefing, the parties stated that if Priests
for Life refused the accommodation, it could be fined $100 per
employee per day. 26 U.S.C. § 4980D. At oral argument,
however, the government informed the court that the ACA imposes
an independent obligation on insurers to sell policies which
comply with the law, including, *e.g.*, coverage for contraceptive
services. *See* Defs.' Suppl. Mem. at 1-4 [ECF No. 31], *citing* 42
U.S.C. §§ 300gg-13; 300gg-22; 76 Fed. Reg. 46,621, 623 (Aug. 3,
2011). This does not alter the analysis, however. Under the
statute and regulations, if Priests for Life refuses the
accommodation, it would then be placed in the position of
providing contraceptive services to its employees as part of its
plan of benefits, and paying for such services. As this Circuit
held in *Gilardi*, this arrangement would substantially burden

The parties agree that Priests for Life does not qualify for an exemption to the contraceptive services mandate. The grandfathered plans provision does not protect the organization because the current health insurance plan has made changes since 2010, including an increase in the percentage cost-sharing requirement. *See* Decl. of Fr. Pavone, ECF No. 7-1, at ¶ 5. Priests for Life also does not satisfy the definition of "religious employer" and is not eligible for an exemption on that ground. *Id.* at ¶ 3. Finally, the parties agree that Priests for Life would qualify as an "eligible organization," entitled to the accommodation, if it completes the self-certification form. Compl. ¶ 6.

Priests for Life states that completing the self-certification form will require it to violate its sincerely held religious beliefs because "the government mandate forces Priests for Life to provide the means and mechanism by which contraception, sterilization and abortifacients are provided to its employees. . . . There is no logical or moral distinction between the [] contraceptive services mandate . . . and the "accommodation[.]" . . . Priests for Life [is] still paying an insurer to provide [its] employees with access to a product [] that violates [its] religious convictions." Compl. ¶¶ 69-70,

---

Plaintiffs' free exercise of religion. *Gilardi*, 733 F.3d at 1216-19.

see also *id.* ¶ 105 ("Priests for Life objects to being forced by the government to purchase a health care plan that provides its employees with access to contraceptives, sterilization and abortifacients, all of which are prohibited by its religious convictions. This is true whether the immoral services are paid for directly, indirectly, or even not at all by Priests for Life.").

On September 19, 2013, plaintiffs moved for a preliminary injunction as to all counts of the Complaint. On September 25, 2013, the parties agreed to consolidate the preliminary injunction motion with the merits under Federal Rule of Civil Procedure 65(a)(2). Thereafter, plaintiffs filed a motion for summary judgment and defendants filed a cross motion to dismiss or in the alternative for summary judgment. Toward the end of the briefing schedule set by the Court, the D.C. Circuit issued its decision in *Gilardi*, addressing religious freedom claims arising from different regulations under the ACA's contraceptive services mandate. Following *Gilardi*, the Court ordered the parties to file supplemental briefs addressing its impact on this case. The Court heard oral argument on the parties' cross motions on December 9, 2013. The motions are ripe for determination by the Court.

## II.  STANDARD OF REVIEW

### A. Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure
12(b)(6) "tests the legal sufficiency of a complaint." *Browning
v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must
contain "a short and plain statement of the claim showing that
the pleader is entitled to relief, in order to give the
defendant fair notice of what the . . . claim is and the grounds
upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
555 (2007) (quotation marks omitted; alteration in original).
While detailed factual allegations are not necessary, plaintiffs
must plead enough facts "to raise a right to relief above the
speculative level." *Id.*

When ruling on a Rule 12(b)(6) motion, the court may
consider "the facts alleged in the complaint, documents attached
as exhibits or incorporated by reference in the complaint, and
matters about which the Court may take judicial notice."
*Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).
The Court must construe the complaint liberally in plaintiffs'
favor and grant plaintiffs the benefit of all reasonable
inferences deriving from the complaint. *Kowal v. MCI Commc'ns
Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). However, the Court
must not accept plaintiffs' inferences that are "unsupported by
the facts set out in the complaint." *Id.* "Nor must the court

accept legal conclusions cast in the form of factual allegations." *Id.* "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

**B. Motion for Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham*

*v. U.S. Navy,* 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia,* 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson,* 477 U.S. at 247.

## III. DISCUSSION

### A. Standing

The parties do not dispute that Priests for Life, a non-profit religious organization, has standing to advance all of its constitutional and statutory claims.  *See, e.g.*, *Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 381, 384 (1990); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467-70 (D.C. Cir. 1996).  The Court, therefore, has jurisdiction to hear and decide the issues presented by this case. *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

While the defendants challenge standing of the individual plaintiffs, they acknowledge that the individual plaintiffs' claims are identical to Priests for Life's claims.  *See* Defs.' Combined Mot. to Dismiss or for Summ. J and Opp'n to Pls.' Mot. (hereinafter "Defs.' Mot.") at 13, n.8.  At oral argument, the

13

parties agreed that it is unnecessary for the Court to address the standing of the individual plaintiffs. *See, e.g.*, *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (it is unnecessary to address the standing of party whose presence or absence is immaterial to a suit's outcome, where another party clearly has standing) (citation omitted). Accordingly, because the presence of the individual plaintiffs has no impact on the merits of this case, the Court need not reach the issue of their standing.

### B. The RFRA

The Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-1, provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." Subsection (b) provides that "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is (1) in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

Congress enacted the RFRA in response to the Supreme Court's decision in *Employment Division, Department of Human Services of Oregon v. Smith*, 494 U.S. 872 (1990), in which the Court held that the right to free exercise of religion under the

14

First Amendment does not exempt an individual from a law that is neutral and of general applicability, and explicitly disavowed the test used in earlier decisions, which prohibited the government from substantially burdening a plaintiff's religious exercise unless the government could show that its action served a compelling interest and was the least restrictive means to achieve that interest. 42 U.S.C. § 2000bb. The purpose of the RFRA was to "restore the compelling interest test" as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). *Id.*

In order to state a prima facie case under RFRA, and thus to survive a motion to dismiss, plaintiffs must allege a substantial burden on their religious exercise. The statute defines "religious exercise" broadly, as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4); 2000cc-5. The RFRA does not define "substantial burden," but because the RFRA intends to restore *Sherbert* and *Yoder*, those cases are instructive in determining the meaning of that term. In *Sherbert*, plaintiff's exercise of her religion was impermissibly burdened when plaintiff was forced "to choose between following the precepts of her religion," resting and not working on the Sabbath and forfeiting certain unemployment benefits as a result, or "abandoning one of the precepts of her religion in

15

order to accept work." 374 U.S. at 404. In *Yoder*, the "impact of the compulsory [school] attendance law on respondents' practice of the Amish religion [was found to be] not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." 406 U.S. at 218.

This Circuit also recently addressed the issue of substantial burden in the context of a RFRA challenge to the ACA in *Gilardi*. The Gilardi brothers are the two owners of closely held for-profit companies. Their companies are not eligible for the accommodations available to Priests for Life; the regulations require such companies to provide contraceptive coverage for the participants and beneficiaries in their group health plans. The Gilardis challenged the provisions of the contraceptive mandate which would have required them to directly provide contraceptive coverage to their employees, claiming it substantially burdened their religious beliefs opposing contraception. The Circuit agreed, finding that "the burden on religious exercise . . . occurs when a company's owners fill the basket of goods and services that constitute a healthcare plan. In other words, the Gilardis are burdened when they are pressured to choose between violating their religious beliefs in managing their selected plan or paying onerous penalties." 733

F.3d at 1217. "The contraceptive mandate," as applied to companies not eligible for the accommodations, "demands that owners like the Gilardis meaningfully approve and endorse the inclusion of contraceptive coverage in their companies' employer-provided plans." *Id.* at 1217-18.

Unlike the Gilardis, Priests for Life is eligible for the accommodations to the mandate, and therefore is not required to provide contraceptive services to its employees. To take advantage of the accommodations, Priests for Life will be required to provide its insurer with a self-certification form stating that it is a religious, non-profit organization which opposes providing coverage for some or all of any contraceptive services required to be covered by the mandate. 78 Fed. Reg. at 39,874, 39,892.[3] Plaintiffs argue that the self-certification

---

[3] In addition, Priests for Life claims that it will be required to "identify its employees to its insurer for the distinct purpose of enabling and facilitating the government's objective of promoting the use of contraceptive services;" Pls.' Mot. for Prelim. Inj. at 7 (hereinafter "Pls.' Mot."); and "coordinate with its insurer when adding or removing employees and beneficiaries from its health care plan to ensure that these individuals receive coverage for contraceptive services," *id.* at 8. Plaintiffs provide no support for their claim that the challenged regulations require either of these things, and admitted at oral argument that Priests for Life must "identify" its employees to its insurer and "coordinate" with its insurer in order to provide its current health care plan to its employees. Priests for Life also suggests, without support, that it will ultimately have to bear the costs of the contraceptive services mandate, because the insurance companies will somehow find a way to either raise premiums to cover the cost of such coverage, or fail to lower premiums to reflect the

substantially burdens their exercise of religion because the accommodations require Priests for Life to "promote, facilitate and cooperate in the government's immoral objective to increase the use of contraceptive services in direct violation of Plaintiffs' sincerely held religious beliefs." Pls.' Mot. at 1. "[B]ecause Priests for Life provides its employees with a health care plan, the government mandate forces Priests for Life to provide the means and mechanism by which contraception, sterilization, and abortifacients (and related education and counseling) are provided to its employees (and beneficiaries), which is unacceptable to Plaintiffs because it violates their sincerely held religious beliefs." *Id.* at 9. "This is true whether the immoral services are paid for directly, indirectly, or even not at all by Priests for Life." *Id*. at 15. In sum, Plaintiffs alleges they are pressured to choose between violating their religious beliefs by "support[ing] and provid[ing] access to" the services provided under the contraception mandate, or "leaving the health care insurance market altogether." *Id*. at 16.

---

savings to the insurer by its provision of such coverage. Pls.' Mot. at 9, n.6, 10, n.7. The plain language of the regulations, however, prohibits insurers from passing along any costs of contraceptive coverage to eligible organizations such as Priests for Life, whether through cost-sharing, premiums, fees, or other charges. 78 Fed. Reg. at 39,875-77. The Court declines, therefore, to find a substantial burden exists on any of these grounds.

Defendants do not question the sincerity of Plaintiffs' religious beliefs, but they do dispute whether the accommodations impose a substantial burden on the exercise of those beliefs.  Defendants argue that the regulations impose no more than a *de minimis* burden on Plaintiffs' religious exercise because the regulations "do not require Priests for Life to "modify [its] religious behavior in any way."" Defs.' Mot. at 15 (quoting *Kaemmerling v. Lappin,* 553 F.3d 669, 679 (D.C. Cir. 2008)).  Defendants contend that Priests for Life "is not required to contract, arrange, pay or refer for contraceptive coverage . . .  Priests for Life need not do anything more than it did prior to the promulgation of the challenged regulations – that is, to inform its issuer that it objects to providing contraceptive coverage in order to insure that it is not responsible for contracting, arranging, paying or referring for such coverage."  *Id.* at 14-15.  The self-certification form only "require[s] [Priests for Life] to inform its issuer that it objects to providing contraceptive coverage, which it has done . . . voluntarily anyway even absent these regulations" in order to insure that it does not provide such coverage.  *Id.* 15-16. Accordingly, Defendants argue that completing the self-certification form "is at most, *de minimis*, and thus cannot be "substantial" under RFRA."  *Id.* 17.  For the reasons set forth below, the Court agrees with the government.

A substantial burden exists when government action puts "substantial pressure on an adherent to modify his behavior and violate his beliefs." *Gilardi*, 733 F.3d at 1216 (quoting *Kaemmerling*, 553 F.3d at 678); *see also Yoder*, 406 U.S. at 218 (law substantially burdens the exercise of religion if it compels individuals "to perform acts undeniably at odds with fundamental tenets of their religious beliefs.") "An inconsequential or *de minimis* burden on religious practice does not rise to this level[.]" *Kaemmerling*, 553 F.3d at 678. Finally, an adherent is not substantially burdened by laws requiring third parties to conduct their internal affairs in ways that violate his beliefs. *Id.* at 679.

In *Kaemmerling*, a federal prisoner claimed that the statutorily mandated collection and use of his DNA for purposes of a national law enforcement database substantially burdened his free exercise rights. Kaemmerling alleged that the collection, storage, and use of his DNA violated his sincerely held religious beliefs. The D.C. Circuit "accept[ed] as true the factual allegations that Kaemmerling's beliefs are sincere and of a religious nature," 553 F.3d at 679. The Court further noted that the government commanded compliance with the statute; failure to cooperate with collection of a fluid sample from which the DNA would be isolated is a misdemeanor offense. *Id.* at 673. Nevertheless, the Court rejected his RFRA claim

because the government was not forcing him to modify his own
behavior.  The Court explained:

> Kaemmerling does not allege facts sufficient to state a
> substantial burden . . . because he cannot identify any
> "exercise" which is the subject of the burden to which he
> objects.  The extraction and storage of DNA information are
> entirely the activities of the FBI, in which Kaemmerling
> plays no role and which occur after the [prison] has taken
> his fluid or tissue sample (to which he does not object).
> The government's extraction, analysis, and storage of
> Kaemmerling's DNA information does not call for Kaemmerling
> to modify his religious behavior in any way – it involves
> no action or forbearance on his part, nor does it otherwise
> interfere with any religious act in which he engages.
> Although the government's activities with his fluid or
> tissue sample after the [prison] takes it may offend
> Kaemmerling's religious beliefs, they cannot be said to
> hamper his religious exercise because they do not "pressure
> [him] to modify his behavior and to violate his beliefs."
> *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981).

> Kaemmerling alleges no religious observance that the DNA
> Act impedes, or acts in violation of his religious beliefs
> that it pressures him to perform. Religious exercise
> necessarily involves an action or practice, as in *Sherbert*,
> where the denial of unemployment benefits "impede[d] the
> observance" of the plaintiff's religion by pressuring her
> to work on Saturday in violation of the tenets of her
> religion, 374 U.S. at 404, or in *Yoder*, where the
> compulsory education law compelled the Amish to "perform
> acts undeniably at odds with fundamental tenets of their
> religious beliefs," 406 U.S. at 218.  Kaemmerling, in
> contrast, alleges that the DNA Act's requirement that the
> federal government collect and store his DNA information
> requires the government to act in ways that violate his
> religious beliefs, but he suggests no way in which these
> governmental acts pressure him to modify his own behavior
> in any way that would violate his beliefs. *See* Appellant's
> Br. at 21 (describing alleged substantial burden as
> "knowing [his] strongly held beliefs had been violated by
> a[n] unholy act of an oppressive regime").

553 F.3d at 679.[4]  The *Kaemmerling* court relied on *Bowen v. Roy*, in which a Native American man objected to the states' use of his child's Social Security number in determining eligibility for welfare benefits.  The parents objected to a statutory requirement that state agencies "shall utilize" Social Security numbers "not because it place[d] any restriction on what [the father] may believe or what he may do, but because he believes the use of the number," a governmental act, "may harm his daughter's spirit."  476 U.S. 693, 699 (1986).  The Supreme Court concluded that the government's use of the child's Social Security number did not impair her parents' freedom to exercise their religion.

> Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family.  The Free Exercise clause simply cannot be understood to require the Government to conduct its own internal affairs in ways

---

[4] Other Circuits have also emphasized the requirement that an adherent be pressured to modify his own conduct in order to show a substantial burden on religious exercise.  *See, e.g.*, *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1067 (9th Cir. 2008) (en banc) (to establish a substantial burden under RFRA, governmental action must "coerce the Plaintiffs to act contrary to their religious beliefs under the threat of sanctions, [or] condition a governmental benefit upon conduct that would violate their religious beliefs."); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) ("within the meaning of RFRA, a substantial burden on religious exercise is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to these beliefs.") (internal citation omitted).

> that comport with the religious beliefs of particular
> citizens. . . . [A]ppellees may not demand that the
> Government join in their chosen religious preferences by
> refraining from using a number to identify their daughter.

*Id.* at 699-700. Other Supreme Court decisions have similarly

rejected free exercise challenges to laws which would not

require a plaintiff to modify his own behavior, but would permit

a third party to engage in behavior to which the plaintiff

objects on religious grounds. In *Lyng*, the Court rejected

Native American tribes' challenge to government building roads

and harvesting timber on national forest land used by the tribes

for religious purposes. The Court explained "government

programs, which may make it more difficult to practice certain

religions but which have no tendency to coerce individuals into

acting contrary to their religious beliefs," do not violate the

First Amendment. 485 U.S. 439, 450 (1988). "The Free Exercise

Clause is written in terms of what the government cannot do to

the individual, not in terms of what the individual can exact

from the government . . . " *Id.* at 451 (quoting *Sherbert*, 374

U.S. at 412 (Douglas, J., concurring)).

In this case, the Court does not doubt the sincerity of

Plaintiffs' beliefs, nor does it doubt that condemnation of

contraception is central to their exercise of the Catholic

religion. "It is not within the judicial ken to question the

centrality of particular beliefs or practices to a faith, or the

validity of particular litigants' interpretation of those

creeds." *Hernandez v. Comm'r of Internal Revenue Serv.*, 490

U.S. 680, 699 (1989).  However, to prevail under the substantial

burden test Plaintiffs must show more than a governmental action

that violates their sincerely held religious beliefs; they must

show that the governmental action forces Priests for Life,

itself, to modify its own behavior in violation of those

beliefs. *Kaemmerling*, 553 F.3d at 679.[5]  This is where

Plaintiffs' RFRA challenge must fail--like the challenges in

*Kaemmerling* and *Bowen*, the accommodations to the contraceptive

mandate simply do not require Plaintiffs to modify their

religious behavior.  The accommodation specifically ensures that

provision of contraceptive services is entirely the activity of

---

[5] For this reason, *inter alia*, the Court is not persuaded by the
rationale articulated in two recent cases that a plaintiff can
meet his burden of establishing that the accommodation creates a
"substantial burden" upon his exercise of religion simply
because he claims it to be so. *See Roman Catholic Archdiocese
of N.Y. v. Sebelius*, No. 12-2542, 2013 U.S. Dist. LEXIS 176432,
*44 (E.D.N.Y. Dec. 13, 2013) (stating that plaintiffs "consider
[completing the self-certification] to be an endorsement of
[contraceptive services] coverage to which they object; to them,
the self-certification compels affirmation of a repugnant
belief.  It is not for this Court to say otherwise."); *see also
Zubik v. Sebelius*, No. 13-1459, 2013 U.S. Dist. LEXIS 165922,
*79-*82 (W.D. Pa. Nov. 21, 2013) (reaching the same conclusion).
In this Court's view, those opinions misconceive RFRA's
substantial burden test, which requires courts to "accept as
true the factual allegations that [a plaintiff's] beliefs are
sincere and of a religious nature – but not the legal
conclusion, cast as a factual allegation, that his religious
exercise is substantially burdened." *Kaemmerling*, 553 F.3d at
679.

a third party – namely, the issuer – and Priests for Life plays
no role in that activity.  As in *Kaemmerling*, "[a]lthough the
[third party]'s activities . . . may offend [plaintiff's]
religious beliefs, they cannot be said to hamper [his] religious
exercise."  553 F.3d at 679.

Priests for Life attempts to distinguish *Kaemmerling* on the
grounds that Mr. Kaemmerling did not object to the government
taking his fluid, hair, or tissue samples; he only objected to
the subsequent extraction and storage of his DNA.  Priests for
Life claims that in this case, "the coverage for the morally
objectionable contraceptive coverage will occur *only* because
Priests for Life has played an *active role* in purchasing a
healthcare plan and then authorizing the issuer of its plan
through "self-certification" to provide the objectionable
coverage directly to its plan participants and beneficiaries (a
role that is prohibited by Plaintiffs' religion) and thereby
cooperating with and thus facilitating the government's illicit
objective "to increase access to and utilization of"
contraceptive services (cooperation that is prohibited by
Plaintiffs' religion)."  Pls.' Combined Opp'n to Govt's
Mot./Reply in Support of Pls.' Mot. (hereinafter "Pls.'
Opp'n/Reply") at 23 (emphasis in original).  The Court does not
find this distinction to be meaningful.  The governmental action
in *Kaemmerling* could not have occurred without the plaintiff

playing an active role by providing a blood sample.
Nevertheless, the court rejected claims that his action
constituted a substantial burden because the action did not, in
and of itself, violate plaintiff's religious beliefs. The fact
that government action thereafter was deeply offensive to his
beliefs did not give rise to a RFRA claim. *See Kaemmerling*, 553
F.3d at 679 (plaintiff's knowledge that his "strongly held
beliefs had been violated by a[n] unholy act of an oppressive
regime" was not enough to violate the RFRA because the
government's actions do not "pressure him to modify his own
behavior in any way that would violate his beliefs."); *see also*
*Bowen*, 476 U.S. at 699-700 (rejecting plaintiff's challenge to
the government's use of his daughter's Social Security number
because it "may harm his daughter's spirit. . . . The Free
Exercise Clause affords an individual protection from certain
forms of governmental compulsion; it does not afford an
individual a right to dictate the conduct of the Government's
internal procedures.")

In this case, Plaintiffs assert an objection to a single
requirement the regulations impose on Priests for Life directly:
completing a self-certification form stating that it is a non-
profit religious organization which objects to providing
contraceptive services coverage. Pls.' Mot. at 7. However,
during oral argument Plaintiffs conceded that they have no

religious objection to the self-certification form, in and of itself.  Rather, Plaintiffs' act under the accommodations becomes burdensome only when it is characterized as "cooperating" with or providing "authorization" for "the government's illicit goal of increasing access to and utilization of contraceptive services."  Pls.' Opp'n/Reply at 23.  But no matter how religiously offensive the statutory or regulatory objective may be, the law does not violate RFRA unless it coerces individuals into acting contrary to their religious beliefs. *See Lyng*, 458 U.S. at 450.  In this case, it is only the subsequent actions of third parties – the government's and the issuer's provision of contraceptive services, in which Priests for Life plays no role – that animate its religious objections.  Under *Bowen* and *Kaemmerling*, however, RFRA does not permit Plaintiffs to proscribe the conduct of others.

Plaintiffs' reliance on *Sherbert*, *Yoder*, and *Thomas* is unavailing.  Pls.' Mot. at 21.  Plaintiffs argue that these cases, particularly *Thomas*, established that the impact of a "substantial burden" need not be direct.  *Id.* at 20.  In each of these cases, however, the burdens of the governmental action – denial of unemployment benefits for refusal to work on the Sabbath or in an armaments factory, threatened criminal prosecution for refusing to send children to school – all fell

directly upon the plaintiffs' participation in or abstention

from a specific religious practice.  That is not the case here;

once again, the only action required of Priests for Life under

the accommodations is *consistent* with its beliefs.  It is only

the independent actions of third parties which result in the

availability of contraceptive services.  *See Conestoga Wood*

*Specialties Corp. v. Sebelius*, 917 F. Supp. 2d 394, 415 & n.15

(E.D. Pa. 2013) (explaining that while an indirect *compulsion*

may constitute a substantial burden, legislation which imposes

only an indirect *burden* on the exercise of religion does not),

*aff'd* 724 F.3d 377 (3d Cir. 2013), *cert. granted*, 2013 U.S.

LEXIS 8418 (U.S. Nov. 26, 2013) (No. 13-354).[6]

This Circuit's recent decision in *Gilardi* does not alter

the analysis.  In *Gilardi*, the plaintiffs themselves (through

---

[6] The Court is not persuaded by the rationale in *Archdiocese of N.Y.*, which states that completing the self-certification form, itself, amounts to a substantial burden on the plaintiffs' exercise of religion, because if they do not complete the form, they are subject to penalties or other forms of government coercion.  *See, Roman Catholic Archdiocese of N.Y.*, 2013 U.S. Dist. LEXIS 176432, *32 (stating that RFRA's "substantial burden" test is met by a finding that plaintiffs face "substantial pressure" to comply with the law.)  The Court agrees with the reasoning of *Kaemmerling*, which, in the Court's view, correctly interpreted *Sherbert*, *Yoder* and *Thomas* to hold that even a threat of criminal sanction did not amount to a substantial burden when it did not impact plaintiff's religious exercise. *Kaemmerling*, 553 F.3d at 679 ("Although the [third party]'s activities . . . may offend [plaintiff's] religious beliefs, they cannot be said to hamper [his] religious exercise.")

their companies) had to provide contraceptive coverage for the participants and beneficiaries of their plan. The Circuit explained that the Gilardis were substantially burdened when they had to place contraceptive coverage into "the basket of goods and services that constitute [their companies'] healthcare plan." *Gilardi*, 733 F.3d at 1218. The Circuit repeated the nature of the burden later in the opinion, defining the burden as a "demand[] that owners like the Gilardis meaningfully approve and endorse the inclusion of contraceptive coverage in their companies' employer-provided plans, over whatever objections they may have. Such an endorsement . . . is a "compel[led] affirmation of a repugnant belief."" *Id.* at 1218 (quoting *Sherbert*, 374 U.S. at 402). Priests for Life need do none of those things. It need not place contraceptive coverage into "the basket of goods and services that constitute its healthcare plan," nor must it even *permit*, much less "approve and endorse" such coverage in its plan. *Gilardi*, 733 F.3d at 1217. On the contrary, Priests for Life need only reaffirm its religiously based opposition to providing contraceptive coverage, at which point third parties will provide the coverage separate and apart from Priests For Life's plan of benefits. In the Court's view, the Circuit's holding on the issue of substantial burden in *Gilardi* is distinguishable from this case.

For the foregoing reasons, the Court finds that Plaintiffs have not stated a *prima facie* case under RFRA because they have not alleged a substantial burden on their religious exercise. Therefore, Count II of the Complaint will be dismissed for failure to state a claim.

C. **The Free Exercise Clause**

The First Amendment provides that Congress shall make no law "prohibiting the free exercise" of religion. *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 132 S.Ct. 694, 702 (2012). The right of free exercise protected by the First Amendment "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990) (quotation omitted). A law is not neutral "if the object of [the] law is to infringe upon or restrict practices because of their religious motivation." *Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993). A law is not generally applicable if it "in a selective manner impose[s] burdens only on conduct motivated by religious beliefs." *Id.* at 543.

This Court agrees with the vast majority of courts which have considered the issue and found that the contraceptive services regulations are neutral and generally applicable, and

accordingly have rejected Free Exercise Clause challenges. *See* Defs.' Mot. at 32 n.5 (citing, e.g., *MK Chambers Co. v. U.S. Dep't of Health & Human Servs.*, U.S. Dist. LEXIS 47887, *13-15 Case No. 13-11379 (E.D. Mich. Apr. 3, 2013); *Conestoga*, 917 F. Supp. 2d at 409-10; *Autocam Corp. v. Sebelius*, 2012 U.S. Dist. LEXIS 184093, *23, Case No. 12-1906 (W.D. Mich., Dec. 24, 2012), *aff'd* 730 F.3d 618 (6th Cir. 2013), *petition for cert. filed*, (U.S. Oct. 15, 2013) (No. 13-482); *Hobby Lobby*, 870 F. Supp. 2d 1278, 1289-90 (W.D. Okl. 2012) *rev'd on other grounds*, 723 F.3d 1114). Although these cases do not specifically address the accommodations to the mandate at issue here, nothing about the specific regulations governing the accommodations leads to a different result.

Plaintiffs do not dispute that the regulations' stated purpose is secular: to promote public health and gender equality. Nevertheless, they argue that the mandate, and its accommodations, is not neutral because it was "designed to target employers who refuse to provide contraceptive services to their employees based on the employers' religious beliefs." Pls.' Mot. for Prelim. Inj. 23-24. They cite the exemption for "religious employers" as defined by 45 C.F.R. § 147.131(a), which applies only to houses of worship and their integrated auxiliaries, but not to other religious organizations, and argue that the exemption divides religious objectors into favored and

disfavored groups without any secular purpose.  Pls.' Mot. at
24.

As several other courts considering the issue have found,
"carving out an exemption for defined religious entities does
not make a law nonneutral as to others."  *Hobby Lobby*, 870 F.
Supp. 2d at 1289 (W.D. Okl. 2012).  In other words, the neutral
purpose of the regulations – to make contraceptive coverage
available to women – is not altered because the legislature
chose to exempt some religious institutions and not others.  On
the contrary, "the religious employer exemption presents a
strong argument in favor of neutrality, demonstrating that the
"object of the law" was not to "infringe upon or restrict
practices because of their religious motivation.""  *O'Brien v.
U.S. Dep't of Health & Human Servs.*, 894 F. Supp. 2d 1149, 1161
(E.D. Mo. 2012) (quoting *Lukumi*, 508 U.S. at 533); *see also*
*Catholic Charities of Diocese of Albany v. Serio*, 7 N.E.2d 510,
522 (N.Y. 2006), *cert. denied*, 552 U.S. 816 (2007) (rejecting
Free Exercise Clause challenge to state law requiring
contraceptive coverage on grounds that the law exempted some,
but not all, religious institutions.  "To hold that any
religious exemption that is not all-inclusive renders a statute
non-neutral would be to discourage the enactment of any such
exemptions—and thus to restrict, rather than promote, freedom of
religion.").  Indeed, Priests for Life itself is the beneficiary

of an accommodation to the regulations, which was enacted for the purpose of *alleviating* any burden on its religious practice.

Plaintiffs argue that a statement in the Overview of the Final Regulations authorizing the religious employer exemption from the mandate reveals a discriminatory intent toward all employers which oppose contraceptive coverage and which do not qualify for the exemption.

> A group health plan . . . qualifies for the [religious employer] exemption if, among other qualifications, the plan is established and maintained by an employer that primarily employs persons who share the religious tenets of that organization . . . . Employers that do not primarily employ employees who share the religious tenets of the organization are more likely to employ individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives. Including these employers within the scope of the exemption would subject their employees to the religious views of the employer, limiting access to contraceptives, and thereby inhibiting the use of contraceptive services and the benefits of preventive care.

Pls.' Mot. at 5, 24 (*quoting* 77 Fed. Reg. 8724, 8728). For the reasons just discussed, this comment lacks significance in the context of a Free Exercise Clause claim. It merely explains that the regulations confer the special benefit of an exemption only for those religious organizations that are essentially houses of worship and their integrated auxiliaries, and who therefore may be permitted to give employment preference to members of their own religion. *See, e.g.*, 42 U.S.C. § 2000e-1(a). That benefit, as discussed above, "is justifiable as a

legislative accommodation--an effort to alleviate a governmentally imposed burden on religious exercise." *Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 85 (Cal. 2004). Those non-profit religious organizations that do not qualify for the exemption but nevertheless are opposed to contraceptive services, like Priests for Life, are also eligible for an accommodation. Finally, employers that do not qualify for an exemption or accommodation are subject to the contraceptive services mandate in the same manner as all other employers, whether religious or non-religious. Accordingly, while the regulations "treat some [] employers" with religious objections to contraceptive coverage "more favorably than other employers, it does not under any circumstance treat [employers with religious objections] less favorably than any other employers." 85 P.3d at 85. Therefore, Plaintiffs' neutrality argument fails.

Plaintiffs also claim that the law is not one of general applicability because "Congress has permitted exemptions from the requirements of the Act," including those for grandfathered plans and certain religious employers. Pls.' Mot. at 24. The existence of categorical exemptions, however, does not mean that the law does not apply generally. *See, e.g., United States v. Lee*, 455 U.S. 252, 261 (1982) (finding social security tax requirements generally applicable despite existence of

categorical exemptions).  As the Supreme Court has held, laws

are not generally applicable when they "in a selective manner

impose burdens only on conduct motivated by religious beliefs."

*Lukumi,* 508 U.S. at 543 (invalidating statute which prohibited

only the religious practice of animal sacrifice, but not hunting

or other secular practices involving killing of animals).  The

regulations in this case do not impose burdens selectively; they

apply to all non-exempt employers, regardless of their religious

beliefs. See *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1134 (9th

Cir. 2009) ("pharmacists who do not have a religious objection

to [filling prescriptions for contraceptives] must comply with

the rules to the same extent—no more and no less—than . . .

pharmacists who may have a religious objection to [filling the

prescriptions].  Therefore, the rules are generally

applicable.")  And again, to the extent the accommodation alters

the analysis, it promotes, not restricts, the free exercise of

religion by excusing from compliance employers such as Priests

for Life due to their religious beliefs.

     Accordingly, the Court concludes that the regulations, and

the accommodations, do not violate the Free Exercise Clause.

Therefore, Count I of the Complaint will be dismissed for

failure to state a claim.

### D. Freedom of Speech and Expressive Association

Plaintiffs next argue that the accommodation to the contraceptive services mandate violates their right to Free Speech and Expressive Association under the First Amendment. They claim the accommodation compels speech, in violation of their deeply held religious beliefs, by requiring them to complete the self-certification form, which then leads to Priests for Life's insurer providing contraceptive coverage. Pls.' Mot. at 31. They claim the same requirement violates their right to associate, which they do for the purpose of expressing a "message that *rejects* the promotion and use of contraceptive services." *Id.* at 29.

As Defendants point out, "every court to review a Free Speech challenge to the prior contraceptive-coverage regulations has rejected it." Defs.' Mot. at 35 (citing, e.g., *MK Chambers Co.*, 2013 U.S. Dist. LEXIS 47887, *15-17; *Conestoga*, 917 F. Supp. 2d at 418; *Autocam*, 2012 U.S. Dist. LEXIS 184093, *23-*25). These cases rely on *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, ("*FAIR*"), a case Plaintiffs do not address. In *FAIR*, the Court rejected a free speech and expressive association challenge to the Solomon Amendment, a statute that conditioned federal funding to law schools upon their agreement to permit military recruiters on campus. The Court found that the statute "neither limits what law schools

may say nor requires them to say anything.  Law schools remain free . . . to express whatever views they may have on the military . . . the [statute] regulates conduct – not speech.  It affects what law schools must *do* – afford access to military recruiters – not what they may or may not say." *FAIR*, 547 U.S. at 60.  The Court found that to the extent that complying with the Amendment required the school to speak, such as by sending emails or posting notices on behalf of military recruiters, such speech was "plainly incidental to the . . . regulation of conduct." *Id.* at 62.  "It has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because such conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* (citation omitted).

A similar analysis applies to this case.  The regulations regarding contraceptive coverage, including the accommodation, place no limits on what Plaintiffs may say; they remain free to oppose contraceptive coverage for all people and in all forms. Rather, the accommodation regulates conduct; specifically, the conduct of Priests for Life's insurance provider.  And like the law schools in *FAIR*, the only speech the accommodations require of Priests for Life is incidental to the regulation of conduct. Priests for Life's speech in this case is its self-certification that it opposes contraceptive coverage.  This speech is

necessary only because it is attendant to the regulation of
conduct, specifically, the insurance company's provision of
contraceptive services.  Indeed, the speech at issue in this
case is even farther from a First Amendment violation than the
speech in *FAIR*; in that case, the speech was incidental to the
law schools' conduct, while in this case the speech is
incidental to the conduct of a wholly separate entity.  And in
any event, the speech at issue here is in *accordance* with
Priests for Life's religious beliefs, not fundamentally opposed
to it.  Cf. *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624
(1943) (invalidating state law requiring Jehovah's Witness
schoolchildren to recite the Pledge of Allegiance and to salute
the flag); *Wooley v. Maynard,* 430 U.S. 705 (1977), (striking
down law that required Jehovah's Witnesses to display the state
motto—"Live Free or Die"—on their license plates).

Plaintiffs argue strenuously in their motion that because
opposition to contraception is a fundamental part of their
organizational message, any provision of contraceptive coverage
by any other party must necessarily interfere with that message
and therefore be considered compelled speech.  See Pls.' Mot. at
28-32.  But this is not the test for compelled speech in
violation of the First Amendment.  As the Court held in *FAIR*,
one speaker who is forced to host another speaker's message may
only assert a compelled-speech violation when the message it is

forced to host is "inherently expressive." *FAIR*, 547 U.S. at 64. For example, the "expressive nature of a parade" was a key part of the holding in *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 568 (1995). Likewise, in *Pacific Gas and Electric Company v. Public Utility Commission of California*, 475 U.S. 1 (1986), the compelled inclusion of a third party newsletter along with Pacific Gas's own newsletter "interfered with the utility's ability to communicate its own message in its newsletter." *FAIR*, 547 U.S. at 64. By contrast, there is nothing inherently expressive about Priests For Life's *insurer*, wholly separate from Priests for Life, providing contraceptive coverage, just as there is nothing inherently expressive about a law school's decision to allow recruiters on campus. *Id.*, see also *Autocam Corp. v. Sebelius*, 2012 U.S. Dist. LEXIS 184093, *23.[7]

_____

[7] Priests for Life also argues that the ACA's requirement that contraceptive coverage include patient education and counseling for women constitutes prohibited speech because it advocates a particular viewpoint or content. See Pls.' Opp'n/Reply at 28. This Court agrees with the *Conestoga* court, which considered and rejected the same argument, explaining, "[w]hile the regulations mandate that [insurance companies] provide coverage for "education and counseling for women with reproductive capacity," which may include information about the contraceptives which Plaintiffs believe to be immoral, they are silent with respect to the content of the counseling given to a patient by her doctor. . . . As such, it cannot be said that Plaintiffs are being required to [host] the advocacy of a viewpoint with which they disagree. Plaintiffs' concern that a doctor may, in some instances, provide advice to a patient that differs from [plaintiffs'] religious beliefs is not one

Plaintiffs' expressive association claim is also devoid of merit. The government violates expressive association rights under the First Amendment by directly interfering with an association's composition by forcing them to accept members or hire employees who would "significantly affect [the association's] expression," *Boy Scouts of America v. Dale*, 530 U.S. 640, 656 (2000). It may also infringe on the freedom of expressive association by passing laws requiring disclosure of anonymous membership lists, or imposing penalties or withholding benefits based on membership in a disfavored group. *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 101-02 (1982); *Healy v. James*, 408 U.S. 169, 180-84 (1972). These laws were invalidated because they "made group membership less attractive, raising [] First Amendment concerns affecting the group's ability to express its message." *FAIR*, 547 U.S. at 69. By contrast, the presence of military recruiters on a law school campus "has no similar effect on a law school's associational rights. Students and faculty are free to associate to voice their disapproval of the military's message; nothing about the statute affects the composition of the group by making group membership less desirable. . . . A military recruiter's mere

---

protected by the First Amendment." *Conestoga*, 917 F. Supp. 2d at 419 (internal citations omitted).

presence on campus does not violate a law school's right to associate, regardless of how repugnant the law school considers the recruiter's message." *Id.* at 69-70.

As in *FAIR*, the regulations and accommodations do not violate Plaintiffs' right to associate. The regulations and accommodations in no way restrict Priests for Life's members, employees, and donors from associating to express their opposition to contraception. Nothing about the regulations or the accommodations force Plaintiffs to accept members or employees it does not desire, nor do they make group membership less desirable as in *Socialist Workers '74* or in *Healy*. Like the plaintiffs in *FAIR*, there can be no doubt that Plaintiffs find the content of the regulations repugnant to their religious beliefs. See Compl. at ¶¶ 87-8, 90 (explaining its beliefs that access to contraception "harms women," is "gravely immoral," and "a grave sin."). However, the fact that a third party provides contraceptive coverage to Priests for Life's employees, separate from Priests for Life or its employer-sponsored health plan, does not affect the group's ability to express its message under the First Amendment, and therefore does not violate its associational rights.

The government has not compelled plaintiffs to speak, nor has it violated their rights to expressive association. Accordingly, Count III of the Complaint will be dismissed.

**E. Establishment Clause and Equal Protection Clause**

The Establishment Clause prohibits the government from showing a preference for any religious denomination over another. *Larson v. Valente*, 456 U.S. 228, 244 (1982). Plaintiffs claim that the contraceptive services mandate, its exemption for religious employers, and its accommodations create an impermissible government preference in favor of churches and religious orders over other religious organizations. Pls.' Opp'n/Reply at 29-30. As with Plaintiffs' Free Speech/Expressive Association Claim, defendants point out that every court to consider an Establishment Clause challenge to the contraceptive services mandate has rejected it. Defs.' Mot. at 39 (citing, e.g., *O'Brien*, 894 F. Supp. 2d at 1162; *Conestoga*, 917 F. Supp. 2d at 416-17). As these courts found, the regulations permit the government to distinguish between religious organizations based on structure and purpose when granting religious accommodations, which is not prohibited under the Establishment Clause. *See, e.g.*, *O'Brien*, 894 F. Supp. 2d at 1163-4 (collecting cases).[8]

---

[8] Plaintiffs claim that under *Larson*, the government is prohibited from making other distinctions among types of religious institutions, in addition to denominational preferences. Pls.' Opp'n/Reply at 31-32. Plaintiffs misread *Larson*. The *Larson* court invalidated the statute at issue not because it distinguished between different types of organizations based on their structure or purpose, but rather because it "was drafted with the explicit intention of including

42

Plaintiffs do not address this authority. The crux of their argument rests on a statement in the Overview of the Final Regulations authorizing the religious employer exemption from the mandate, which states in relevant part:

> A group health plan . . . qualifies for the [religious employer] exemption if, among other qualifications, the plan is established and maintained by an employer that primarily employs persons who share the religious tenets of that organization . . . . Employers that do not primarily employ employees who share the religious tenets of the organization are more likely to employ individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives. Including these employers within the scope of the exemption would subject their employees to the religious views of the employer, limiting access to contraceptives, and thereby inhibiting the use of contraceptive services and the benefits of preventive care.

Pls.' Mot. at 35 (*quoting* 77 Fed. Reg. at 8728); Pls.' Opp'n/Reply at 33 (same). The Court has already considered this statement in the context of Plaintiffs' Free Exercise Clause challenge and found it constitutionally permissible. See *supra* at III.C. Nor does it violate the Establishment Clause, because it delineates the contours of a religious accommodation that applies equally to organizations of every faith and does not favor any denomination over another. *See, e.g., Walz v. Tax Comm'n of City of New York*, 397 U.S. 664 (1970) (rejecting Establishment Clause challenge to law exempting from property

_____

particular religious denominations and excluding others." 456 U.S. at 254.

taxes property of religious organizations used exclusively for religious worship); *Droz v. Comm'r of IRS*, 48 F.3d 1120, 1124 (9th Cir. 1995) (upholding Social Security tax exemption only for members of organized religious sects, despite the fact that "some individuals receive exemptions, and other individuals with identical beliefs do not," because the purpose of the exemption was not to discriminate among religious denominations).

Plaintiffs' Equal Protection claim is identical to its other First Amendment Claims: they claim the regulations, religious employer exemption and accommodation impinge on Priests for Life's fundamental right to free exercise of religion, freedom of speech and expressive association. Pls.' Mot. at 33. The Court has already rejected these underlying claims, however. "Where a plaintiff's First Amendment free exercise claim has failed, the Supreme Court has applied only rational basis scrutiny in its subsequent review of an equal protection fundamental right to religious free exercise claim based on the same facts." *Wirzburger v. Galvin*, 412 F.3d 271, 282-83 (1st Cir. 2005) (citing *Locke v. Davey*, 540 U.S. 712, 721 (2004). Applying rational basis scrutiny to the fundamental rights-based claim that the regulations violate equal protection, the Court has no trouble determining that the contraceptive services mandate is rationally related to the legitimate government purposes of promoting public health and

gender equality.  *See, e.g.*, *Dep't of Agriculture v. Moreno*, 413 U.S. 528, 533 (1973).  Indeed, Plaintiffs do not argue that the regulations would fail such review.

The Plaintiffs have failed to state a claim under the Establishment Clause or the Equal Protection Clause.  Therefore, Counts IV and V will be dismissed.

**IV.   CONCLUSION**

For the foregoing reasons, the defendants' motion to dismiss all counts of Plaintiffs' Complaint is **GRANTED**; accordingly, the parties' cross motions for summary judgment are **DENIED AS MOOT.**  An appropriate Order accompanies this Memorandum Opinion.

**Signed:      Emmet G. Sullivan**
              **United States District Judge**
              **December 19, 2013**